# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

———————————————————— :
WUESTHOFF HEALTH SYSTEM, INC., : 
                           :
           **Plaintiff,** :     Civil Action No. No. 6:05-cv-
                           :     1454- Orl-22JGG
   **v.** : 
                           :     **JURY TRIAL DEMANDED**
HEALTH FIRST, INC., HOLMES REGIONAL :     **INJUNCTIVE RELIEF**
MEDICAL CENTER, INC., CAPE :     **SOUGHT**
CANAVERAL HOSPITAL, INC., HEALTH :
FIRST PHYSICIANS INC., AND :
HEALTH FIRST HEALTH PLANS, INC. :
                           :
           **Defendants.** :
———————————————————— :

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1.    This case arises under the Federal Antitrust Act, specifically, Section 7 of the Clayton Act, and Sections 1 & 2 of the Sherman Act.  It is intended to create freedom of choice for consumers of health care services – i.e., patients –and lower costs of health benefits for employers by restoring competition on the merits for general acute care inpatient hospital services in South and Central Brevard County, Florida.

2.    The defendants, the Health First Organizations, together dominate the markets for general acute care inpatient hospital services and outpatient surgery services in South Brevard County, Florida, and the broader markets for general acute care inpatient hospital services and outpatient surgery services in South and Central Brevard County, as well as the

markets for the sale of Medicare managed care plans and small group commercial managed care plans.

3.    The defendants have undertaken a series of anticompetitive and impermissible acts, including an illegal affiliation, illegal forced bundling of Health First hospital facilities, the development of a dominant health plan that is utilized to augment defendants' power in the market for hospital services, the building of a new Health First Hospital that would forestall additional competition, the establishment of restrictive covenants to further prevent additional hospital competition, and the improper use of the administrative Certificate of Need ("CON") process in furtherance of its goals.

4.    Moreover, physicians of defendant Health First Physicians and other independent physicians and physician groups have received numerous economic benefits, including the right to participate as a provider in Health First Health Plans, in return for their willingness to refer or otherwise utilize Health First hospital facilities for their patients who are not members of Health First Health Plans.  Physicians risk the elimination of these benefits by utilizing Wuesthoff facilities.

5.    Defendants' impermissible conduct has, in fact, been successful in limiting patient choice, and in restricting hospital competition, and has rewarded physicians who refer or otherwise utilize Health First facilities while, at the same time, punishing, and/or threatening to punish physicians who utilize Wuesthoff facilities, to the detriment of patients, employers, and competition.

6.    As a result of the above actions, employers and other purchasers of health care have been forced to pay supra-competitive (monopoly) prices for hospital services and health

insurance.

## PARTIES

7.    Plaintiff, Wuesthoff Health System, Inc. ("Wuesthoff"), is a not-for-profit corporation organized and existing under the laws of the State of Florida.  Wuesthoff owns and operates Wuesthoff Medical Center-Rockledge, a 265 bed general acute care hospital located in Rockledge, Florida, within Central Brevard County, and Wuesthoff Medical Center-Melbourne, a 115 bed acute care hospital located in Melbourne Florida, within South Brevard County.

8.    Defendant Health First, Inc. ("Health First"), is a corporation organized and existing since 1995 under the laws of the State of Florida, with its principal place of business in South Brevard County, Florida.  Health First is the parent corporation of Holmes Regional, Palm Bay Community Hospital, Cape Canaveral Hospital, Inc., Health First Health Plans, Inc. and Health First Physicians, Inc.

9.    Defendant Holmes Regional is a 514 bed general acute care hospital located in Melbourne, Florida.  Palm Bay Community Hospital ("Palm Bay"), is a 60 bed general acute care satellite hospital located in Palm Bay, Florida.  Although they are separate hospital facilities, Holmes Regional and Palm Bay are part of the same hospital corporation.

10.   Defendant Cape Canaveral Hospital, Inc. ("Cape Canaveral") is a 150 bed general acute care hospital located in Cocoa Beach, Florida.  Health First does not own or lease the Cape Canaveral facility.

11.   Holmes Regional and Palm Bay are both located in South Brevard County, and Cape Canaveral is located in Central Brevard County.

12.  Defendant Health First Health Plans, Inc. is a Florida for-profit corporation which operates a health maintenance organization ("HMO").  Health First Health Plans is owned and controlled by its parent corporation, Health First.

13.  Defendant Health First Physicians ("HFP") is a Florida professional corporation which provides medical services through physician employees.  HFP is a multispecialty physician group, and is the physician subsidiary of Health First.  HFP claims to be the "largest multispecialty group" located in Central Brevard County.  According to the Health First web site, HFP physicians serve patients residing in both Central Brevard County and the Palm Bay area.  HFP physicians do not serve the Melbourne area of South Brevard County, although that area is the location of Holmes Regional, the Health First flagship hospital.  HFP is comprised of some physicians who previously practiced independently and who had admitted to both Cape Canaveral and Wuesthoff Medical Center-Rockledge, as well as some physicians who were recruited into the area by Health First specifically to become physician employees of the HFP.  On information and belief, the HFP physicians are paid at higher than market rates, and they have agreed to admit exclusively to Health First hospital facilities as a condition of their employment.

14.  Hereinafter, the defendants collectively may be referred to as "Health First," or "the Health First Organizations."

**JURISDICTION AND VENUE**

15.  This action is brought pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 14 and 26).  Plaintiff seeks statutory damages and injunctive relief from ongoing violations of the antitrust laws of the United States, specifically, Sections 1 and 2 of the

Sherman Act (15 U.S.C. §§ 1 & 2), and Section 7 of the Clayton Act (15 U.S.C. §18).  The

jurisdiction of this Court is founded on those sections and on 28 U.S.C. § 1331.

16.  Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## Interstate Commerce

17.  A large percentage of the defendants' revenues come from sources located

outside of Florida, including the federal government (through the Medicare and Medicaid

programs).

18.  The defendants purchase a substantial portion of their medicine and supplies

from sellers located outside of Florida.

19.  Many employers that have made payments to the defendants (either directly or

through health insurers) sell products or services in interstate commerce.  The prices paid by

those employers for general inpatient care services and outpatient surgery have a substantial

impact on the prices of products and services that those businesses sell within Florida and in

other states.

## COUNT I
## IMPERMISSIBLE MERGER IN VIOLATION OF SECTION 7
## (15 U.S.C. § 18)

20.  In mid-1995 Holmes Regional affiliated with Cape Canaveral to create Health

First.  Health First's market dominance in the South and Central Brevard County market for

general acute care inpatient hospital services was augmented as a result of this 1995

affiliation.

21.  The unlawful affiliation has reduced and eliminated acute care inpatient hospital

competition in the markets for general acute care inpatient hospital services and outpatient

surgery services in South and Central Brevard County in violation of Section 7 of the Clayton Act.

22.  The affiliation has enabled the defendants to restrict and eliminate competition on the merits for managed care contracts by permitting defendants to utilize their market power as leverage to compel and induce managed care plans to divert patients from plaintiff Wuesthoff's hospitals to Health First-operated facilities, especially Cape Canaveral, and to thereby foreclose competition on the merits for acute care inpatient hospital services as well as outpatient surgery services in the relevant market.

## The Relevant Geographic Market

23.  The relevant geographic market for this Count is no larger than a combination of South and Central Brevard County, Florida.

24.  Only physicians can admit patients to hospitals and, for this reason, the hospital affiliations of physicians are important in determining the boundaries of the relevant geographic market.

25.  In this regard, there is virtually no overlap between the physicians who admit to general acute care hospitals located within South and Central Brevard County and physicians who admit to general acute care hospitals located outside South and Central Brevard County.

26.  There is extremely low cross elasticity of demand between general acute care hospitals located outside South and Central Brevard County, and general acute care hospital facilities located within South and Central Brevard County.  The hospital facilities located in South and Central Brevard County would have the economic power, if acting collectively, to increase prices (at least 5%) above current levels.

6

27.  Managed care plans cannot substitute general acute care hospitals located outside South and Central Brevard County for general acute care hospitals located within South and Central Brevard County.

28.  Patients located within South and Central Brevard County typically do not utilize general acute care hospitals located outside South and Central Brevard County for general acute care hospital services available within South and Central Brevard County.

29.  Patients located outside South and Central Brevard County typically do not utilize general acute care hospitals located within South and Central Brevard County for general acute care hospital services available outside Southern and Central Brevard County.

30.  General acute care hospitals located within South and Central Brevard County offer prices to managed care plans without regard to the prices charged to managed care plans by non-affiliated general acute care hospitals located outside South and Central Brevard County.

31.  General acute care hospitals located outside South and Central Brevard County offer prices to managed care plans without regard to the prices charged to managed care plans by non-affiliated general acute care hospitals located within South and Central Brevard County.

32.  If all of the general acute care hospitals located within South and Central Brevard County combined to raise hospital prices at least 5% above current levels, they would not lose volume sufficient to such a price increase unprofitable.

## **Relevant Product Market**

33.  The relevant product markets for this Count are general acute care inpatient

hospital services and outpatient surgery performed in either a hospital or free-standing ambulatory surgery center (hereinafter collectively referred to as "hospital services").

34.  With respect to general inpatient acute care hospital services, there is extremely low cross elasticity of demand between general acute care inpatient hospital services and outpatient services.  A small but significant price increase (at least 5%) in the price of general acute care inpatient hospital services by all South and Central Brevard County hospitals will not cause patients to switch to outpatient services in sufficient volume to make that price increase less than fully profitable.  The choice of inpatient, as opposed to outpatient, services, is largely determined by physicians, and is based on the medical needs of the patient, not on the relative cost of the services.  With respect to outpatient surgery performed in a hospital or free-standing ambulatory surgery center, outpatient surgeries performed in doctor's offices are not substitutable for the vast majority of outpatient surgeries performed in either a hospital or freestanding ambulatory surgery center.  Although freestanding ambulatory surgery centers not owned by Health First are located in the relevant market, these facilities do not act as a sufficient competitive constraint on the price of outpatient surgery performed at defendants' hospitals to induce competitive pricing of these services by Health First hospitals.  One reason for this is that many patients who receive outpatient surgery in a hospital cannot be adequately treated at a freestanding ambulatory surgery center.

## Market Power and its Exercise

35.  As a result of the affiliation, Health First has at least a 60% market share within the South and Central Brevard geographic market for general acute care inpatient hospital services and at least a 50% market share of outpatient surgery services.  The regulatory

requirements of the Florida Certificate of Need Law (CON) establish high barriers to entry into the market for general acute care inpatient hospital services.

36.  Holmes Regional is a general acute care hospital which managed care plans must have in their network to successfully market their managed care products in South and Central Brevard County.  Without the participation of this "must have" hospital, managed care plans cannot successfully market their managed care plans in South and Central Brevard County.

37.  The affiliation has permitted Health First to exercise market power in the relevant market in at least two ways.  First, managed care plans must contract with all the Health First hospitals in order to obtain a contract with Holmes Regional.  This has permitted Cape Canaveral to successfully charge prices for general acute care inpatient services and/or hospital services that are well above competitive levels, and more specifically exceed Wuesthoff's prices.

38.  Before the affiliation between defendant Holmes Regional and defendant Cape Canaveral hospitals, managed care plans historically were able to contract selectively by choosing between, or threatening to choose between, Wuesthoff Medical Center-Rockledge and Cape Canaveral in Cocoa Beach for general acute care inpatient hospital services and/or outpatient surgery services in Central Brevard County.  As a result of this direct competition between Wuesthoff Medical Center-Rockledge and Cape Canaveral, hospital prices charged to managed care plans were lower in Central Brevard County than in South Brevard County where Holmes Regional faced little competition.

39.  Subsequent to the affiliation that created Health First, the combined Health First

entities have exercised their market power by forcing managed care plans to contract with Cape Canaveral as a condition of obtaining a contract with Holmes Regional, thereby forcing managed care plans to pay supra-competitive prices for services provided at Cape Canaveral. Specifically, as a result of post-affiliation bundling by Health First, managed care plans have lost the ability to construct hospital networks that include only Holmes Regional and Wuesthoff Medical Center-Rockledge. The loss of this option has permitted Health First to raise prices for general acute care inpatient hospital services and/or outpatient surgery services at Cape Canaveral. In addition, the post-affiliation bundling has permitted Health First to maintain its dominant market position in South Brevard County. Wuesthoff has funded the construction and growth of Wuesthoff-Melbourne with profits generated at Wuesthoff Medical Center-Rockledge. Bundling has artificially reduced managed care volume at Wuesthoff's flagship facility in Rockledge, and the consequent loss of profit has impeded the growth of Wuesthoff's Melbourne campus.

40. Dominant hospital systems, like Health First, can, and do, eliminate the ability of managed care plans to achieve lower hospital prices. Health First accomplishes this by forcing managed care plans to contract with all of its hospital facilities as a group, and by requiring those managed care plans to pay those hospitals higher than competitive prices as a condition for inclusion of Holmes Regional, in their hospital networks. As noted, Holmes Regional is a "must have" hospital for managed care plans seeking to successfully market managed care products in South and Central Brevard County. Hospitals and other providers often accept relatively low discounted pricing contractual arrangements favorable to managed care plans in order to avoid the risk of losing business to other providers. However,

selective contracting cannot be an effective strategy for benefiting consumers unless managed care plans can make meaningful choices between hospital providers.

41.  Plaintiff Wuesthoff has suffered competitive injury in the form of lost volume at both of its facilities as a result of defendants' wrongful affiliation.

<u>**COUNT II**</u>
<u>**CONTRACT, COMBINATION AND CONSPIRACY IN RESTRAINT OF TRADE**</u>
<u>**(Illegal Agreement between Holmes Regional And Cape Canaveral Hospitals)**</u>
<u>**(15 U.S.C. § 1)**</u>

42.  The affiliation of Holmes Regional and Cape Canaveral constitutes an unlawful combination and conspiracy between said defendants in violation of Section 1 of the Sherman Act under either the *per se* standard, or, alternatively, a full or truncated rule of reason analysis.

43.  The affiliation between the defendant hospital facilities was simply an elevation of form over substance, does not meet the requirements necessary to establish a single entity for purposes of the antitrust laws, and was undertaken to insulate Cape Canaveral from direct competition for managed care contracts from Wuesthoff Medical Center-Rockledge.

44.  On information and belief, Holmes Regional and Cape Canaveral do not share profits and losses, and retain independent liability for indebtedness.  Moreover, the two hospitals function predominately as separate institutions.  They maintain separate medical staffs with little overlap.  In addition, on information and belief, Cape Canaveral and Holmes Regional hospitals have not created efficiencies through the integration of clinical services. In fact, since the affiliation, Cape Canaveral has affirmatively opposed clinical integration, and the two hospitals have duplicated clinical services such as cardiac services.

45.  The affiliation has enabled the defendants to restrict and eliminate competition

on the merits between Wuesthoff Medical Center-Rockledge and Cape Canaveral for managed care contracts by requiring managed care plans to contract with Cape Canaveral at supra-competitive prices as a condition for obtaining a contract with Holmes Regional.  This behavior causes managed care plans to divert patients from plaintiff Wuesthoff's hospitals to Health First-operated facilities, especially Cape Canaveral, and thereby to foreclose competition on the merits for acute care inpatient hospital services.  The bundling adversely affects price competition between Cape Canaveral and Wuesthoff Medical Center-Rockledge in Central Brevard County, and, by reducing volume at Wuesthoff Medical Center-Rockledge impedes the growth of Wuesthoff-Melbourne and adversely affecting price competition in South Brevard County.

## The Relevant Geographic Market

46.  The relevant geographic market for this Count of the Complaint is no larger than a combination of South and Central Brevard County, Florida.

47.  Only physicians can admit patients to hospitals and, for this reason, the hospital affiliations of physicians are important in determining the boundaries of the relevant geographic market.

48.  In this regard, there is virtually no overlap between the physicians that admit to general acute care hospitals located within South and Central Brevard County, and physicians that admit to general acute care hospitals located outside South and Central Brevard County.

49.  The hospital facilities located in South and Central Brevard County would have the economic power, if acting collectively, to increase prices of general acute care inpatient hospital services and/or outpatient surgery services (at least 5%) above current levels.  There

is extremely low cross elasticity of demand between general acute care hospitals located outside South and Central Brevard County, and general acute care hospital facilities located within South and Central Brevard County.

50. Managed care plans cannot substitute general acute care hospitals located outside South and Central Brevard County for general acute care hospitals located within South and Central Brevard County.

51. Patients located within South and Central Brevard County typically do not utilize general acute care hospitals located outside South and Central Brevard County for hospital services available within South and Central Brevard County.

52. Patients located outside South and Central Brevard County typically do not utilize general acute care hospitals located within South and Central Brevard County for hospital services available outside Southern and Central Brevard County.

53. General acute care hospitals located within South and Central Brevard County offer prices to managed care plans without regard to the prices charged to managed care plans by non-affiliated general acute care hospitals located outside South and Central Brevard County.

54. General acute care hospitals located outside South and Central Brevard County offer prices to managed care plans without regard to the prices charged to managed care plans by non-affiliated general acute care hospitals located within South and Central Brevard County.

55. If all of the general acute care hospitals located within South and Central Brevard County combined and attempted to raise prices for general acute care inpatient

hospital services and/or outpatient surgery services by at least 5%, they would not lose enough volume to make such a price increase unprofitable.

## **Relevant Product Market**

56.  The relevant product markets for this Count are hospital services as defined in Count I.

57.  With respect to general inpatient acute care hospital services, there is extremely low cross elasticity of demand between general acute care inpatient hospital services and outpatient services.  A small but significant price increase (at least 5%) in the price of general acute care inpatient hospital services will not cause patients to switch to outpatient services in sufficient volume to make that price increase less than fully profitable.  The choice of inpatient, as opposed to outpatient, services, is largely determined by physicians, and is based on the medical needs of the patient, not on the relative cost of the services.  With respect to outpatient surgery performed in a hospital or free-standing ambulatory surgery center, outpatient surgeries performed in doctor's offices are not substitutable for the vast majority of outpatient surgeries performed in these two settings.  Although freestanding ambulatory surgery centers not owned by Health First are located in the relevant market, these facilities do not act as a sufficient competitive constraint on the price of outpatient surgery performed at defendants' hospitals to induce competitive pricing of these services by Health First hospitals.  One reason for this is that many patients who receive outpatient surgery in a hospital cannot be adequately treated at a freestanding ambulatory surgery center.

## **Market Power**

58.  As a result of the affiliation, Health First has at least a 60% market share within

14

the South and Central Brevard geographic market for general acute care inpatient hospital services, and at least a 50% market share of outpatient surgery services.  Additionally, the regulatory requirements of the Florida Certificate of Need Law (CON) establish high barriers to entry into the market for general acute care inpatient hospital services.

59.  Perhaps more importantly, Holmes Regional is a "must have" general acute care hospital for managed care plans seeking to successfully market their managed care products in South and Central Brevard County.  Without the participation of this "must have" hospital, managed care plans cannot successfully market their managed care plans in South and Central Brevard County.

### Unlawful Concerted Action

60.  The affiliation has permitted Health First to insist that managed care plans contract with all the Health First hospitals in order to obtain a contract with Holmes Regional.  This practice has permitted Health First to successfully charge prices for general acute care inpatient services and/or hospital services that are well-above competitive levels, and more specifically exceed Wuesthoff's prices.

61.  Prior to the affiliation between defendant Holmes Regional and defendant Cape Canaveral hospitals, managed care plans could selectively contract by choosing between, or threatening to choose between, Wuesthoff Medical Center-Rockledge and Cape Canaveral for hospital services in Central Brevard County.  As a result of this competition, hospital prices charged to managed care plans were lower in Central Brevard County, where there was hospital competition, than in South Brevard County where there was little, if any, hospital competition, as a result of the dominance of Holmes Regional.

62. The affiliation has permitted Health First to exercise market power in the relevant market in at least two ways. First, managed care plans must contract with all the Health First hospitals in order to obtain a contract with Holmes Regional. This has permitted Cape Canaveral to successfully charge prices for general acute care inpatient services and/or hospital services that are well above competitive levels, and more specifically exceed Wuesthoff's prices.

63. Dominant hospital systems, like Health First, can, and do, eliminate the ability of managed care plans to achieve lower hospital prices. Health First accomplishes this by forcing managed care plans to contract with all of its hospital facilities as a group, and by requiring those managed care plans to pay those hospitals higher than competitive prices as a condition for inclusion of Holmes Regional, in their hospital networks. As noted, Holmes Regional is a "must have" hospital for managed care plans seeking to successfully market managed care products in South and Central Brevard County. Hospitals and other providers often accept relatively low discounted pricing contractual arrangements favorable to managed care plans in order to avoid the risk of losing business to other providers. However, selective contracting cannot be an effective strategy for benefiting consumers unless managed care plans have meaningful choices between hospital providers.

64. Plaintiff Wuesthoff has suffered competitive injury in the form of lost volume at both of its facilities as a result of defendants' wrongful affiliation.

## COUNT III
## MONOPOLIZATION, HOSPITAL MARKET
## (15 U.S.C. § 2)

65.  In violation of the Section 2 of the Sherman Act, defendants have exercised and maintained monopoly power over general acute care inpatient hospital services and/or hospital services in South Brevard County.

### The Relevant Geographic Market

66.  The relevant geographic market for this Count is South Brevard County, Florida.

67.  Only physicians can admit patients to hospitals, and, for this reason, the hospital affiliations of physicians are important in determining the boundaries of the relevant geographic market.

68.  In this regard, there is very little overlap between the physicians who admit to general acute care hospitals located within South Brevard County and physicians who admit to general acute care hospitals located outside South Brevard County.

69.  Defendants' hospital facilities located in South Brevard County have the economic power to increase prices (at least 5%) above competitive levels.

70.  There is extremely low cross elasticity of demand between general acute care hospitals located outside of South Brevard County, and general acute care hospital facilities located within South Brevard County.

71.  Managed care plans cannot substitute general acute care hospitals located outside South Brevard County for general acute care hospitals located within South Brevard County.

72.  Patients located within South Brevard County typically do not utilize general acute care hospitals located outside South Brevard County for hospital services available within South Brevard County.

73.  General acute care hospitals located within South Brevard County offer prices to managed care plans without regard to prices charged to managed care plans by non-affiliated general acute care hospitals located outside South Brevard County.

**Relevant Product Market**

74.  The relevant product markets for this Count are general acute care inpatient hospital services and outpatient surgery performed in either a hospital or free-standing ambulatory surgery center (collectively "hospitals services").

75.  With respect to general inpatient acute care hospital services, there is extremely low cross elasticity of demand between general acute care inpatient hospital services and outpatient services.  A small but significant price increase (at least 5%) in the price of general acute care inpatient hospital services by general acute care hospitals in South Brevard County will not cause patients to switch to outpatient services in sufficient volume to make that price increase less than fully profitable.  The choice of inpatient, as opposed to outpatient, services, is largely determined by physicians, and is based on the medical needs of the patient, not on the relative cost of the services.  With respect to outpatient surgery performed in a hospital or free-standing ambulatory surgery center, outpatient surgeries performed in doctor's offices are not substitutable for the vast majority of outpatient surgeries performed in those two settings.  Although freestanding ambulatory surgery centers not owned by Health First are located in the relevant market, these facilities do not act as a sufficient competitive constraint

18

on the price of outpatient surgery performed at defendants' hospitals to induce competitive pricing of these services by Health First hospitals.  One reason for this is that many patients who receive outpatient surgery in a hospital cannot be adequately treated at a freestanding ambulatory surgery center.

### Monopoly Power

76.  Defendants have monopoly power in the market for general acute care inpatient hospital services and/or in outpatient surgery services in South Brevard County.  With the exception of the recently completed, and relatively small, Wuesthoff Medical Center-Melbourne, defendant Health First owns and operates the only general acute care hospitals located in South Brevard County, and has almost an 80% market share in that market. Additionally, the regulatory requirements of the Florida Certificate of Need Law (CON) establish high barriers to entry into the market for general acute care inpatient hospital services.  With respect to outpatient surgery services performed in a hospital or free-standing ambulatory surgery center, Health First possesses a 60% market share.

77. One of Health First's South Brevard County hospitals, Holmes Regional, is a "must have" general acute care hospital facility for managed care plans seeking to do business in more highly populated South Brevard County, where approximately half of the County's population resides.  Wuesthoff Medical Center-Melbourne is currently too small to provide the same range of services that Holmes Regional provides and is only a limited competitor to Holmes Regional.  Health First has engaged in anticompetitive conduct to insure that Wuesthoff Medical Center-Melbourne does not gain the ability to compete effectively with Holmes Regional.

78.   While there is some competition between Holmes Regional and Wuesthoff Medical Center-Rockledge for patients who live on the border of South and Central Brevard County, that competition is insufficient to defeat an attempted exercise of monopoly power or induce competitive pricing by the Health First hospitals in South Brevard County.

**Anticompetitive Conduct**

79.   Although Health First Health Plans sell commercial managed care plan products at higher than competitive levels, it is nonetheless able to offer a premium that is somewhat below the premium charged by other health plans because these other health plans must pay Health First hospitals exorbitant, supra-competitive rates for hospital services.

80.   By charging very high supra-competitive hospital rates to commercial managed care plans, Health First is able to retard the growth of these independent plans vis-à-vis Health First Health Plan.   Since the independent plans contract with Wuesthoff Health System hospitals, the effect is also to retard the growth of Wuesthoff's facilities, notably Wuesthoff Medical Center-Melbourne.   As such, Health First's pricing behavior to managed care plans represents a barrier to Wuesthoff Health System' expansion and preserves the monopoly power of Health First's hospitals in South Brevard County.

81.   With respect to Medicare managed care, Health First hospitals do not contract with non-Health First managed care plans.   Health First hospitals' failure to contract with other Medicare managed care plans constitutes an additional barrier to Wuesthoff's expansion because other Medicare plans who would contract with Wuesthoff are deterred from entering the Medicare managed care market.

82.   Enrollees who are enrolled in the commercial and Medicare products offered by

Health First Health Plans are steered to Health First hospitals when they require hospital services. This steerage allows the Health First hospital facilities to exploit and augment their market power through the use of the Health First Health Plans, and the physicians that participate in that plan, which include the Health First Physicians, and Melbourne Internal Medicine Associates.

83.  Even if Wuesthoff became a participating provider in Health First Health Plans, it would be of little utility because physicians on the Health First Health Plans panel agree to admit most of their non-Health First Health Plan patients to Health First's hospitals.  As previously stated, physicians admit patients to hospitals, and for the most part, the physicians participating in Health First Health Plans do not admit to Wuesthoff.  Indeed, only 18% of all admissions made by the physicians participating in the Health First Health Plans were admitted to Wuesthoff hospital facilities, far fewer than the percentage of patients admitted to Wuesthoff facilities by physicians participating in other major health plans.  Thus, if Wuesthoff's hospitals were to participate in Health First Health Plans, that would only serve to increase the market share and market power of the Health First hospitals while, at the same time, reducing the number of admissions to Wuesthoff hospital facilities.

84. Without Holmes Regional in their hospital networks, managed care plans attempting to successfully sell their product in South Brevard County would not have a desirable hospital network from the perspectives of employers or patients.  By forcing managed care plans to contract with all Health First hospitals in order to obtain a contract with Holmes Regional, Health First has forced managed care plans to select, and pay more for, the services of Cape Canaveral and Palm Bay than they otherwise would have paid—all

in order to contract with Holmes Regional, the "must have" hospital, in the managed care health plan's hospital network. As a result of defendants' unjustified and unlawful conduct, competition for managed care business has been lessened in the South and Central Brevard County areas, managed care plans and employers have had fewer hospital alternatives with which to negotiate contracts, and patients have been deprived of freedom of choice.

85.   The Health First hospitals do not have any legitimate, pro-competitive business justification for the forced "bundling" of all the Health First hospitals. The policy serves to prevent Wuesthoff, the lower priced producer of general acute care inpatient hospital services and/or outpatient surgery services, from obtaining managed care business that now goes to the more costly Health First hospitals. The bundling of Health First hospitals not only reduces Wuesthoff Medical Center-Rockledge's managed care volume, but it retards the growth of Wuesthoff Medical Center-Melbourne in South Brevard County, since that facility is largely dependent on the profits generated by Wuesthoff Medical Center-Rockledge for the capital needed to expand services and become a more significant competitor to Holmes Regional. As a consequence, Holmes Regional is able to maintain its monopoly power in South Brevard County.

86.   Defendants' flagship hospital, Holmes Regional, a 514 bed hospital which dominates the provision of acute care inpatient services in Southern Brevard County, continues to attempt to obtain a Certificate of Need so that it can build and operate an economically unjustified hospital facility, as recently determined in a Florida administrative proceeding by the Administrative Law Judge (ALJ). The ALJ's findings of fact with respect

to competition were upheld by the State Administrative Agency, the Agency for Health Care Administration (AHCA).

87.  More specifically, the ALJ determined, and AHCA agreed, that the additional Health First hospital facility would not increase patient choice and would have the effect of reducing hospital competition by weakening, or eliminating, competition from plaintiff Wuesthoff, Health First's only hospital competitor in South and Central Brevard County, and by foreclosing the possibility of additional competition from other potential hospital competitors.  The proposed financials for the new facility, as evaluated by the ALJ, were not based on a sound business justification.  Rather, financial analysis demonstrated that the new facility was, at best, marginally profitable for the applicant, Holmes Regional, and unprofitable for the entire Health First system.

88.  The obvious question, of course, is why would Health First propose a venture that is marginally profitable or even unprofitable?  The answer is equally obvious—to preserve Health First's monopoly price structure by preventing Wuesthoff Health Systems from expanding its Melbourne facility to price-compete more effectively with Holmes Regional in the South Brevard County market.  If Wuesthoff Medical Center-Melbourne develops fully as a competitor to Holmes Regional, Health First stands to lose far more profit than it would sacrifice if Viera Medical Center is built.

89.  At the same time, the Health First proposal makes it less likely that any other potential competitors could build their own competing hospital facility in the Viera area.  In this regard, the ALJ correctly recognized, that while Health First's proposed Viera facility would create an additional hospital facility, it would not increase patient choice, add a new

competitor in the market for general acute care inpatient hospital services, or increase competition.  Indeed, the ALJ rightly concluded that the Health First Viera facility would actually decrease competition, by jeopardizing Wuesthoff's ability to compete with Health First.

90.   Health First's most recent effort to obtain a CON itself abuses the administrative process, having used misrepresentations to obtain a preliminary approval of a yet third application.  For example, the Administrative Law Judge ("ALJ"), who rejected the first application  wrote only six months ago: "PBCH [Palm Bay] is currently an underutilized facility …. Its annual occupancy rate is projected to be only 60.1 percent in 2008 and 65.4 percent in 2010, which are well below . . . optimum utilization level[s]."[1]

91.   However, in a feat of skillful legerdemain, in its third application Health First simply made the harmful Palm Bay statistic disappear: in "new and revised" projections for 2010, it took 37 projected patients per day from Holmes Regional and switched them to Palm Bay.  By this sleight of hand – without adding a single new patient – Palm Bay's projected 2010 utilization rate "increased" from the "below optimum" level of 65.4 percent to 77 percent – which Health First wrongfully alleges is "too full" to be an alternative to a new hospital.

92.   To further assure that competitors could not consider building their own hospital facility near Viera, Health First obtained a restrictive covenant with the Viera Company,

---

[1]      Only two of Health First's applications have gone beyond the level of CON staff review and recommendations to formal hearing before an Administrative Law Judge.  Health First dismissed its request for a hearing on its second application, which was preliminarily rejected, the hearing on the preliminary approval of the third application issued on December 16, 2005 took place this summer.

which controls approximately 17,800 acres surrounding the potential location of the new hospital facility.

93.   Defendants also restrict patient choice and limit managed care plans' ability to obtain lower prices in South Brevard County by controlling the admissions to Wuesthoff's hospital facilities made by physicians.   In this regard, Health First has impermissibly provided benefits to physicians who utilize Holmes Regional or Palm Bay, while punishing physicians who use Wuesthoff Medical Center-Melbourne.

94. Physicians are required by their ethical responsibilities, and by law, to act in the best interest of their patients, rather than acting on the basis of economic incentives to restrict competition and to steer patients to Health First hospitals.   Indeed, the American Medical Association's (AMA) Code of Medical Ethics provides that a person's right to choose a physician and free competition among physicians are "prerequisites of ethical practice." AMA Code of Medical Ethics at § E-9.06.

95. Through their own Health First Health Plans, the defendants offer physicians access to a patient base that is unparalleled in Brevard County, if not the state of Florida.   Of course, not all physicians are permitted to participate in the Health Plan, and participation on the Health Plan physician panel is a benefit that Health First utilizes with care and purpose to reward physicians that are loyal to that institution.

96. The results can best be seen with reference to the Medicare population, a patient group that typically is free to utilize any hospital.   In 2004, the last full calendar year for which data are available, physicians who participated in Health First Health Plans utilized Health First hospital facilities for 85% of their Medicare discharges, and Wuesthoff facilities

for only 15% of all of their Medicare discharges, including all of the discharges for which the Medicare patients should have been given freedom of choice.  There can be no question that, in the aggregate, the Health First Health Plans physician panel is critical to patient volume at Health First hospital facilities, accounting for approximately 70% of all discharges from those facilities in 2004.  In contrast, physicians that did not participate on the Health First Health Plans Physician Panel utilized Wuesthoff facilities for 58% of their Medicare discharges, while using Health First hospital facilities for only 42% of their Medicare discharges.

97. On several occasions Health First has threatened to bring in employed physicians to compete with physicians that do not comply with Health First's demands to cooperate with them.  Some physicians capitulate, but when they do not, Health First has delivered on its threats.

98. Health First has been willing to pay in excess of market rates to recruit employed physicians, and those physicians, in turn, have delivered patients to Health First hospitals.  As with the new proposed hospital facility, on information and belief, the operation of Health First Physicians, does not make economic sense as normal business ventures, because the purchase and operation of the physician practices costs Health First more than the practice profits generated by the physicians whose practices were purchased.  The obvious justification must be that the payments by Health First to these physicians is intended to ensure that all of the patients of these physicians are admitted exclusively to Health First hospital facilities when those patients require hospitalization.

99. Again, the dramatic results can be seen with reference to the Medicare

population, a patient group that typically is free to utilize any hospital.  In 2004, the last full calendar year for which data are available, Health First employed physicians utilized Health First hospital facilities for 99% of their Medicare discharges, and Wuesthoff facilities for only 1% of their Medicare discharges.

100. Health First has also provided additional benefits to Melbourne Internal Medicine Associates ("MIMA").  For example, in order to permit MIMA to establish an orthopedic practice, Holmes Regional opened the orthopedic specialty on its medical staff after it had been closed for years, although there was no indication that additional orthopedists were needed.  Moreover, MIMA physicians have been provided representation on Health First Boards of Directors, and in the administration of Health First Health Plans, and have been provided an opportunity to participate with Health First on joint ventures, such as a same day surgery center, and a Gastro-Intestinal (GI) procedure center.  Less favored physicians are not provided the same opportunities.  Indeed, the joint venture surgery center is the only surgery center permitted to participate in the Health First Health Plans.

101. For their part, MIMA physicians retain complete loyalty to Health First. Virtually 100% of their inpatient hospital discharges were from Health First hospitals in calendar year 2004, the last full year for which data is available.  During the same calendar year, less than 1% of MIMA physician discharges were from Wuesthoff facilities.

102. The episode involving Dr. Hynes, an employee of Brevard Orthopaedic, Spine & Pain Clinic (the "Clinic") and a well-regarded spinal surgeon is instructive.  Until recently, Dr. Hynes and the other employees of the Clinic performed surgery exclusively at Holmes Regional and participated in the Health First Health Plans.  Recently, however, Dr. Hynes

27

began to perform some surgical procedures at Wuesthoff Medical Center-Melbourne. Although Dr. Hynes and the other physician employees of the Clinic were commended by Health First Health Plans and recredentialed for a three year period in October 2005, in December of the same year, Dr. Hynes was called at Wuesthoff Medical Center-Melbourne, while he was performing a surgical procedure, and was informed that he and the other employees of the Clinic were being terminated from Health First Health Plans "for business reasons."  The purpose of this punishment is to send a message to other physicians on the Health First Health Plans' panel who might be contemplating the admission of some of their non-Health First Health Plan patients at the Wuesthoff facilities.  At the same time HFP hired a new back surgeon, who was made a participating physician on the Health First Health Plans' physician panel.   This physician performs her surgeries exclusively at Holmes Regional.

103. Even prior to that time, when Dr. Hynes and his group decided to develop an ambulatory surgery center Health First elected to initiate a joint venture rather than compete. However, Health First subsequently proposed carving out profitable Gastro- Intestinal (GI) procedures in a separate GI center whose ownership was to be limited to more favored physicians, including MIMA.

104. Dr. Hynes and his group agreed to go along with their exclusion from the GI Center in return for Health First's assurance that the past dispute would not adversely affect the group's position as providers on the Health First Health Plans provider panel.  Obviously, Dr. Hynes' added surgical procedures at Wuesthoff changed Health First's view of any commitment it had to the group's continued status as Health First Health Plan providers.

28

105. Defendants' conduct has resulted in higher prices and fewer alternatives for managed care plans doing business in South Brevard County, and has thereby caused injury to competition, to consumers, and to plaintiff.

106. Plaintiff Wuesthoff Health System has suffered competitive injury in the form of lost admissions at both of its facilities.  Plaintiff Wuesthoff Health System has also expended considerable funds to defend itself against Health First's repeated anticompetitive efforts to build Viera Medical Center.

**COUNT IV**
**ATTEMPT TO MONOPOLIZE THE MARKET FOR HOSPITAL SERVICES**
**(15 U.S.C. § 2)**

107. Defendants have market power in the market for general acute care inpatient services and outpatient surgery performed in a hospital or freestanding ambulatory surgery center in South and Central Brevard County.  Defendants' market share in the former market is at least 60% and its share in the latter market exceeds 50%.

108. In violation of Section 2 of the Sherman Act, and with specific intent to do so, defendants have acted to exercise and to extend the monopoly power they hold in the general acute care inpatient hospital services market in South Brevard County in order to restrain trade and exclude competition and to obtain monopoly power over the provision of general acute care inpatient hospital services in the entire area of South and Central Brevard County.

**The Relevant Geographic Market**

109. The relevant geographic market for this Count of the Complaint is no larger than the combination of South and Central Brevard County, Florida.

29

110. Only physicians can admit patients to hospitals, and, for this reason, the hospital affiliations of physicians are important in determining the boundaries of the relevant geographic market.

111. In this regard, there is virtually no overlap between the physicians who admit to general acute care hospitals located within South and Central Brevard County, and physicians who admit to general acute care hospitals located outside South and Central Brevard County.

112. The hospital facilities located in South and Central Brevard County would have the economic power, if acting collectively, to increase prices (at least 5%) above current levels.   There is extremely low cross elasticity of demand between general acute care hospitals located outside South and Central Brevard County, and general acute care hospital facilities located within South and Central Brevard County.

113. Managed care plans cannot substitute general acute care hospitals located outside South and Central Brevard County for general acute care hospitals located within South and Central Brevard County.

114. Patients located within South and Central Brevard County typically do not utilize general acute care hospitals located outside South and Central Brevard County for general acute care hospital services available within South and Central Brevard County.

115. Patients located outside South and Central Brevard County typically do not utilize general acute care hospitals located within South and Central Brevard County for general acute care hospital services available outside Southern and Central Brevard County.

116. General acute care hospitals located within South and Central Brevard County offer prices to managed care plans without regard to prices charged to managed care plans by non-affiliated general acute care hospitals located outside South and Central Brevard County.

117. General acute care hospitals located outside South and Central Brevard County offer prices to managed care plans without regard to prices charged to managed care plans by non-affiliated general acute care hospitals located within South and Central Brevard County.

118. If all of the general acute care hospitals located within South and Central Brevard County combined to raise prices of general acute care inpatient hospital services or outpatient surgery services by at least 5%, they would not lose enough volume to make those price increases unprofitable.

### Relevant Product Market

119. The relevant product markets for this Count are general acute care inpatient hospital services and outpatient surgery performed in a hospital or freestanding ambulatory surgery center.

120. With respect to general inpatient acute care hospital services, there is extremely low cross elasticity of demand between general acute care inpatient hospital services and outpatient services.  A small but significant price increase (at least 5%) in the price of general acute care inpatient hospital services by hospitals in South and Central Brevard County will not cause patients to switch to outpatient services in sufficient volume to make that price increase less than fully profitable.  The choice of inpatient, as opposed to outpatient, services, is largely determined by physicians, and is based on the medical needs of the patient, not on the relative cost of the services.  With respect to outpatient surgery performed in a hospital or

free-standing ambulatory surgery center, outpatient surgeries performed in doctor's offices are not substitutable for the vast majority of outpatient surgeries performed in that setting. Although freestanding ambulatory surgery centers not owned by Health First are located in the relevant market, these facilities do not act as a sufficient competitive constraint on the price of outpatient surgery performed at defendants' hospitals to induce competitive pricing of these services by Health First hospitals. One reason for this is that many patients who receive outpatient surgery in a hospital cannot be adequately treated at a freestanding ambulatory surgery center.

### Market Power and Anticompetitive Effects

121. As a result of the affiliation described above Health First has at least a 60% market share within the South and Central Brevard geographic market for general acute care inpatient hospital services, and at least a 50% share of outpatient surgery services. Additionally, the regulatory requirements of the Florida Certificate of Need Law (CON) establish high barriers to entry into the market for general acute care inpatient hospital services.

122. Perhaps more importantly, Holmes Regional is a "must have" general acute care hospital for managed care plans seeking to successfully market their managed care products in South and Central Brevard County. Without the participation of this "must have" hospital managed care plans cannot successfully market their managed care plans in South and Central Brevard County.

123. Defendants' attempt to monopolize the markets for general acute care inpatient hospital services and outpatient surgery services in South and Central Brevard County has

involved the predatory, exclusionary, and anticompetitive conduct described in Count III above.

124. In light of defendants' already significant market power in the market for general acute care inpatient hospital services and outpatient surgery services in South and Central Brevard County, their conduct poses a dangerous probability that defendants will be successful in achieving monopoly power in the provision of general acute care inpatient hospital services and outpatient surgery services in both South and Central Brevard County.

125. Defendants' conduct has resulted in higher prices and fewer alternatives for general acute care inpatient hospital services and outpatient surgery services and has caused injury to consumers, to competition, and to plaintiff.

126. Specific intent by Health First to obtain a monopoly can be inferred from Health First's conduct described herein, including the affiliation between Holmes Regional and Cape Canaveral. Indeed, there can be no doubt of Health First's specific intent to maintain monopoly power. For example, when Wuesthoff first proposed to initiate direct competition with Health First in South Brevard County by building a relatively small hospital facility, Health First initiated an aggressive regulatory challenge. Specifically, in 1998 and 1999 defendants utilized the Florida Certificate of Need ("CON") process to delay, and to increase the costs of Wuesthoff's entrance into the South Brevard County market. In 2000, the state agency responsible for administering the state's CON law, the Florida Agency for Health Care Administration ("AHCA"), ultimately determined that the CON should be issued because the new facility would benefit competition.

127. Plaintiff Wuesthoff Health System has suffered competitive injury in the form of

33

lost admissions at both its facilities due to the conduct described in this Count and Count III above.  Plaintiff Wuesthoff Health System has also expended considerable funds to defend itself against Health First's repeated anticompetitive efforts to build Viera Medical Center.

<u>**COUNT V**</u>
<u>**ILLEGAL TYING AGREEMENT**</u>
<u>**(15 U.S.C. § 1)**</u>

128. In violation of Section 1 of the Sherman Act defendants have forced and compelled managed care plans to enter into contracts which are designed and serve to limit the ability of managed care plans to contract with hospitals of their choosing, and thereby coercively divert patients from plaintiff to Health First hospitals.

129. Specifically, defendants have tied the ability of managed care plans to contract with Holmes Regional for the provision of general acute care inpatient hospital services and outpatient surgery services to the requirement that such plans also contract with Cape Canaveral and Palm Bay for the provision of these hospital services.

<u>**Relevant Markets**</u>

130. The relevant product markets for this Count are the same as the relevant markets described in Counts I, II, III, and IV of this Complaint.  The relevant geographic markets are as follows:  the relevant geographic market for the tying product is South Brevard County. The relevant geographic market for the tied product is Central Brevard County.

131. Health First has significant market power in the markets for general acute care inpatient hospital services and outpatient surgery services in South Brevard County.  Health First possesses an almost 80% market share in the market for general acute care inpatient hospital services in South Brevard County and at least a 60% outpatient surgery share in that

geographic market.  Additionally, the regulatory requirements of the Florida Certificate of Need Law (CON) establish high barriers to entry into the market for general acute care inpatient hospital services.

132. Holmes Regional, is a "must have" general acute care hospital facility for managed care plans seeking to do business in more highly populated South Brevard County, where approximately half of the County's population resides.  Wuesthoff Medical Center-Melbourne is currently too small to provide the same range of services that Holmes Regional provides and is a limited competitor to Holmes Regional.

133. By means of the unlawful tying arrangement, defendants have conditioned a contract with Holmes Regional on managed care plans' agreements to contract with all Health First hospitals, especially Cape Canaveral.  This illegal tying forecloses competition on the merits between Wuesthoff and Cape Canaveral for contracts with managed care plans.  This has resulted in higher hospital services prices in Central Brevard County.  But for this tying, managed care plans would have the option of contracting with one or both of Wuesthoff and Cape Canaveral.  Given the tying agreement, managed care plans can choose only between adding or not adding Wuesthoff to their hospital panel.  Contracting or not contracting with Cape Canaveral is not an option.  The tying agreement has caused injury to consumers, employers and competition, as well as to plaintiff Wuesthoff.  Defendants' conduct constitutes an illegal and impermissible tying contract under either the "*per se*" or "rule of reason" standard of liability governing conduct actionable under Section 1 of the Sherman Act.

134. Plaintiff Wuesthoff has suffered competitive injury in the form of lost patient volume as a result of defendants' wrongful conduct.

## COUNT VI

## CONTRACTS, COMBINATIONS AND CONSPIRACIES IN RESTRAINT OF TRADE  (Physician Agreement)
### (15 U.S.C. § 1)

135. As previously stated, physicians are required by their ethical responsibilities, and by law, to act in the best interest of their patients, rather than acting on the basis of economic incentives to restrict competition and to steer patients to Health First hospitals.  Indeed, the American Medical Association's (AMA) Code of Medical Ethics provides that a person's right to choose a physician and free competition among physicians are "prerequisites of ethical practice."  AMA Code of Medical Ethics at § E-9.06.

136. On information and belief, Health First, and its employed physicians, acting in concert with other physicians, and physician groups, collectively have allocated the market for physician services.

137. On information and belief, and in violation of Section 1 of the Sherman Act, defendants, including defendant Health First Physicians, the largest multispecialty medical group located in Central Brevard County, in combination with independent physicians and physician groups that participate on the Health First Health Plans physician panel, including but not limited to MIMA, a group of independent physicians that represents the largest multispecialty medical group in South Brevard County, and one or more other independent physicians and/or physician groups, as yet unknown to plaintiff, have acted in concert to restrain trade and exclude competition.

138. On information and belief, pursuant to its agreement with MIMA, Health First has provided assurance that it will not utilize employed physicians to compete with MIMA, so long as, in return, MIMA physicians admit their patients, exclusively to Health First hospital facilities, and not to plaintiff Wuesthoff's hospital facilities.

139. Health First has also provided additional benefits to MIMA.  For example, in order to permit MIMA to establish an orthopedic practice, Holmes Regional opened the orthopedic specialty on its medical staff after it had been closed for years, although there was no indication that additional orthopedists were needed.  Moreover, MIMA physicians have been provided representation on Health First Boards of Directors, and in the administration of Health First Health Plans, and have been provided an opportunity to participate with Health First on joint ventures, such as a same day surgery center, and a Gastro-Intestinal (GI) procedure center.  Less favored physicians are not provided the same opportunities.  Indeed, the joint venture surgery center is the only surgery center permitted to participate in the Health First Health Plans.

140. For their part, MIMA physicians retain complete loyalty to Health First. Virtually 100% of their inpatient hospital discharges were from Health First hospitals in calendar year 2004, the last full year for which data is available.  During the same calendar year, less than 1% of MIMA physician discharges were from Wuesthoff facilities.

141. As a result of their agreement with Health First not to utilize any hospital facilities except Health First hospitals, MIMA announced that its physicians would no longer participate with Aetna Health Plan, because Health First's hospitals are not participating in Aetna's provider network, even though Wuesthoff's hospitals do participate.

142. Absent their agreement with Health First there would be no reason for the MIMA physicians to walk away from their patients who are enrolled in Aetna's health plan, particularly since MIMA has stated publicly that Aetna's physician reimbursement is adequate, and was not the reason for its unwillingness to continue as a participating provider.

143. Similarly, apart from MIMA's agreement to exclusively use Health First's hospitals, Health First would have no reason not to employ physicians who would compete with MIMA in the Melbourne area, its major base of operation.

144. Health First's agreements with physicians, like the other anticompetitive conduct described herein, serve no other purpose, except to lessen competition, and patient choice.

145. The unlawful Section 1 conspiracy has, in fact, resulted in the payment of higher prices by patients and employers for general acute care inpatient hospital services and outpatient surgery services, because MIMA, HFP and the other conspiring physicians refer their patients to the more expensive Health First's hospitals.

146. Defendants and their co-conspirators have foreclosed competition on the merits for hospital services in South and Central Brevard County.  This has resulted in higher prices and fewer alternatives for hospital services and caused injury to consumers, competition, and plaintiff.

147. Plaintiff Wuesthoff Health System has suffered competitive injury in the form of lost admissions at both of its facilities due to the conduct described in this Count.

## COUNT VII
## MONOPOLIZATION, MEDICARE MANAGED CARE MARKET
### (15 U.S.C. § 2)

148. The federal Medicare program permits certain managed care plans to offer their

services on a "risk basis" to Medicare beneficiaries as an alternative to the traditional Medicare program.  Managed care plans operating under "risk" contracts may offer Medicare beneficiaries incentives in the form of extra benefits not available in the traditional Medicare program in order to encourage them to select a particular Medicare managed care health plan.

149. In violation of the Section 2 of the Sherman Act defendants unlawfully have exercised and maintained monopoly power over Medicare managed care plans in South and Central Brevard County because Health First's hospitals do not contract with Medicare managed care plans other than Health First Health Plans' own Medicare managed care plan.

### The Relevant Geographic Market

150. The relevant geographic market for this Count is no larger than a combination of South and Central Brevard County, Florida.

151. All managed care plans, including Medicare managed care plans offer networks of physicians and hospitals.

152. Medicare managed care plans that sell policies in South and Central Brevard County, Florida do not compete with Medicare managed care plans that sell outside this area. The reason is that Medicare beneficiaries demand policies that enable access to local hospitals and physicians.  Just as the general non-Medicare population does not consider hospitals located outside the area to be acceptable alternatives for hospitals located within the area, that portion of the over-65 population that would favorably consider enrollment in a Medicare managed care health plan has the same preference for access to local hospitals.  As such, Health First Health Plans' Medicare managed care plan competes only with other Medicare managed care plans which also offer access to South and Central Brevard County

39

hospitals.

## The Relevant Product Market

153. The relevant product market is the market for the purchase of Medicare Managed Care products.  This market is open only to Medicare beneficiaries.  There is no cross elasticity of demand between Medicare managed care products and commercial managed care products sold to the under-65 population because it is not cost-effective for Medicare beneficiaries to drop their Medicare coverage and switch to a commercial plan. Participants in Medicare managed care plans are eligible for traditional Medicare fee-for-service benefits, but the benefit levels and effective cost to the beneficiary differ significantly from Medicare managed care products, and as a result, there is low cross elasticity of demand between these two Medicare products.  Upon information and belief, there is little switching of beneficiaries from Medicare managed care plans to fee-for-service Medicare.

154. Medicare managed care plans are required to offer a minimum set of benefits.  In addition, the plans compete with one another by offering additional benefits at little or no charge to the beneficiary.  When only a single Medicare managed care plan operates in an area, beneficiaries do not benefit from the non-price competition which occurs when multiple Medicare managed care plans compete for the same beneficiary population.

## Monopoly Power and Anticompetitive Conduct

155. Health First Health Plans have an overwhelming 95% share of the market for Medicare Managed Care.  The decision of the Health First hospital facilities to contract only Health First Health Plans' Medicare managed care plan, constitutes a barrier to entry in the Medicare managed care market because independent non-Health First Medicare managed

care plans either cannot afford to enter the geographic market or must enter without the only must have hospital—i.e., Holmes Regional.

156. Defendants have utilized their monopoly power over Medicare managed care plans to divert actual and potential Medicare managed care enrollees from other Medicare managed care plans to Health First Health Plans; and correspondingly have diverted these patient/enrollees from plaintiff.

157. Defendants' conduct with respect to Medicare managed care contracting has resulted in fewer alternatives and reduced benefits for Medicare managed care services and has diverted these patient/enrollees from plaintiff, thereby causing injury to competition, to consumers, and to plaintiff.

158. Plaintiff Wuesthoff Health System has suffered competitive injury in the form of lost managed care admissions at both its facilities.

**COUNT VIII**
**ATTEMPT TO MONOPOLIZE THE SMALL GROUP COMMERCIAL MANAGED CARE MARKET**
**(15 U.S.C. § 2)**

159. In violation of Section 2 of the Sherman Act, defendants, with the specific intent to do so, have acted to obtain monopoly power in the Small Group Commercial managed care market in the geographic market of South and Central Brevard County by extending monopoly hospital prices to independent managed care plans who compete against Health First Health Plans in the sale of health benefits to small groups.

160. Supra-competitive hospital pricing by the Health First hospitals to these plans reduces the ability of these plans to compete against Health First Health Plans for employer accounts.  Wuesthoff Health System is harmed by this conduct because the independent

managed care plans, who also contract with the Wuesthoff hospitals, obtain less enrollment. As a result of their lower enrollment, Wuesthoff hospitals obtain less patient volume.  The supra-competitive pricing by Health First's hospitals to these plans limits the overall substitution of the less expensive Wuesthoff hospitals for the more expensive Health First hospitals.

### Relevant Geographic Market

161. The relevant geographic market for this Count is no larger than a combination of South and Central Brevard County, Florida.

162. Small group commercial managed care plans utilize networks of physicians and hospitals.  Because small employers located in South and Central Brevard County demand access to hospitals and doctors convenient to their employees, they will purchase small group products only from those carriers who offer a network of South and/or Central Brevard providers.  Upon information and belief, there are only a handful of significant carriers selling such products to employers located in South and Central Brevard County.

### The Relevant Product Market

163. The relevant product market for this Count is the market for small employer group commercial insurance.

164. Health benefits are sold primarily to groups, mainly employers.  Typically, small employer groups are extremely sensitive to the price of the health benefits, because they generally have less to spend.  Indeed, a significant percentage of small employers do not provide health benefits to their employees because they can not afford to.  When small employers do provide health insurance typically they are required or choose to limit their

employees to a single health plan, in contrast to the multiple health plan options often offered by larger employers.  Many insurance companies do not actively pursue the underwriting of small employer accounts meaning that in many areas only a handful of companies are significant competitors in the small group market.

165. Health plan prices to small employers also are higher than health plan prices to larger employers partly because small employers do not have self-insurance as an option. Therefore, small employers have a lower elasticity of demand for commercial health plan services than do large employers.

## Market Power and Anticompetitive Conduct

166. Supra-competitive pricing by the Health First hospitals to small group commercial managed care plans has enabled Health First Health Plans to dominate the extremely price sensitive small group commercial managed care market.  On information and belief, Health First Health Plans has more than a 50% market share in the Small Group Commercial managed care market.  Moreover, the monopoly pricing extended by Health First hospitals to small group commercial plans constitutes a barrier to entry because it is difficult for independent plans to enter and compete successfully against Health First Health Plans.

167. Defendants have utilized their market power to divert commercial managed care enrollees, and particularly small group enrollees, from other managed care plans to Health First Health Plans; and correspondingly have diverted these patient/enrollees away from plaintiff.

168. Defendants' exercise of their market power has resulted in higher small group

commercial managed care prices and has caused injury to consumers, employers, competition, and plaintiff.

169. In light of defendants' market power, and the extension of monopoly hospital rates to independent commercial plans selling health benefits to small groups poses a dangerous probability that defendants will be successful in achieving monopoly power in the market for Commercial Small Group managed care services in South and Central Brevard County.

170. There can be no doubt of Health First's specific intent to obtain monopoly power, which can be inferred from the impermissible conduct described herein.

171. Plaintiff Wuesthoff Health System has suffered competitive injury in the form of lost managed care admissions at both its facilities.

## COUNT IX
## CONSPIRACY TO MONOPOLIZE, HOSPITAL MARKET
### (15 U.S.C. § 2)

172. As previously stated, the Health First defendants have market power in the market for general acute care inpatient hospital services and outpatient surgery services in South and Central Brevard County.

173. Only physicians can admit patients to hospitals, and, for this reason, the hospital affiliations of physicians are important in determining the boundaries of the relevant geographic market.

174. In violation of Section 2 of the Sherman Act, and with specific intent to do so, defendants, including defendant Health First Physicians, on information and belief, in combination with the largest multispecialty medical group located in Central Brevard

44

County, MIMA, and other physicians participating in Health First Health Plans, as yet unknown to plaintiff, have acted in concert to exercise and to extend the monopoly power defendants' hold in South Brevard County in order to restrain trade and exclude competition and obtain monopoly power over the provision of general acute care inpatient hospital services and outpatient surgery services in the entire area of South and Central Brevard County.

175. Defendants' conspiracy to monopolize the market for general acute care inpatient hospital services and outpatient surgery services in South and Central Brevard County has involved the predatory, exclusionary, and anticompetitive conduct described in Counts III and IV.

176. Defendants' conspiratorial agreement requires that HFP, MIMA physicians, and other Health First Health Plans physicians, as yet unknown to plaintiff, admit patients to Health First hospitals, and to not admit patients to plaintiff's hospital facilities

177. Specific intent by Health First to obtain a monopoly can be inferred from Health First's conduct described in Counts III and IV and the affiliation between Holmes Regional and Cape Canaveral.  Indeed, there can be no doubt of Health First's specific intent to maintain monopoly power.  For example, when Wuesthoff first proposed to initiate direct competition with Health First in South Brevard County by building a relatively small hospital facility, Health First initiated an aggressive regulatory challenge.

178. Similarly, there can be no doubt of MIMA's specific intent to assist Health First's efforts to obtain and maintain monopoly power, as amply demonstrated by the fact that MIMA physicians admit virtually exclusively to Health First, although, in the absence of

45

a conspiracy with Health First, it would not be in their economic interest to do so.

179. The improper steerage of patients to Health First by MIMA physicians, as well as Health First's actions which induce steerage represent overt acts in furtherance of the unlawful conspiracy.

180. The unlawful conspiracy has resulted in higher prices for hospital services, and patients having fewer alternatives for hospital services, thereby, causing injury to consumers, employers, competition, and plaintiff.

181. Plaintiff Wuesthoff Health System has suffered competitive injury in the form of lost admissions at both its facilities due to the Conduct described in this Count and Counts III and IV.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands a trial by jury on all matters so triable under law, and respectfully request that, based on the verdict of the jury, the Court enter a judgment against defendants Health First, Inc., Holmes Regional, Inc., Cape Canaveral Hospital, Inc., Health First Health Plans, Inc., and Health First Physicians, which:

A. Adjudges and decrees that defendants unlawfully have exercised and maintained monopoly power in the market for hospital services in South Brevard County, and the market for Medicare managed care services in violation of Section 2 of the Sherman Act;

B. Adjudges and decrees that defendants have attempted to monopolize the market for hospital services in the market of South and Central Brevard County, and

the small group commercial managed care market in violation of Section 2 of the Sherman Act;

C.  Adjudges and decrees the defendants have engaged in an unlawful tying agreement in violation of Section 1 of the Sherman Act;

D.  Adjudges and decrees the defendants have engaged in unreasonable restraints of trade in violation of Section 1 of the Sherman Act;

E.  Invalidates any arrangements between any of the Heath First Organizations and any physician and/or medical group conspiring with any of the defendants, including but not limited to Health First Physicians (HFP), to utilize Health First hospital facilities exclusively or disproportionately;

F.  Orders that all physicians contracting with, or employed by, any Health First Organization, be permitted to become members of the medical staff of any hospital, be required to provide written freedom of choice to all their patients, and be required to permit their patients to select the hospital facility of their choice;

G.  Prohibits any of the Health First Organizations from building a new general acute care hospital in the Viera area;

H.  Orders the divestiture of defendant Cape Canaveral Hospital from defendant Health First;

I.  Invalidates the non-compete provision preventing the construction of any competing hospital facility in the 17,800 acre area surrounding the proposed site for the new Holmes Viera hospital facility;

J.   Orders the divestiture of defendant Health First Physicians (HFP) from defendant Health First;

K.   Orders the divestiture of defendant Health First Health Plans from defendant Health First;

L.   Enjoins the defendants from:

      (i.)   requiring managed care plans or other payors to contract or otherwise deal with another Health First hospital as a condition for contracting with any given Health First hospital;

      (ii.)   requiring as a condition for the offer or grant of any price or discount that a managed care plan or other payor contract with all Health First hospitals in order to contract with any Health First hospital;

      (iii.)   providing preferential pricing to Health First Health Plans to the detriment of other managed care plans;

M.  Awards plaintiff the damages caused to it by defendants' conduct, as required by statute;

N.  Awards plaintiff its reasonable attorney's fees and costs incurred in pursuing this action in accordance with the federal antitrust laws; and

O.  Grants plaintiff such other and further relief as may be equitable and just under the circumstances.

Dated this 28 day of August 2006.

Respectfully Submitted,
/s/ William G. Kopit
_____

**William G. Kopit, Esq**.
District of Columbia Bar No. 922070
E-mail: wkopit@ebglaw.com
**Lee Calligaro, Esq.**
District of Columbia Bar No. 186809
E-mail: lcalligaro@ebglaw.com
**Patricia M. Wagner, Esq.**
District of Columbia Bar No. 470680
E-mail: pwagner@ebglaw.com
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street NW
Washington, D.C. 20037
 (202) 861-0900 Telephone
(202) 296-2882 Facsimile

**Michael J. Glazer, Esq.**
Florida Bar No. 286508
E-mail: mglazer@ausley.com
Ausley & McMullen
227 South Calhoun Street
P.O. Box 391 (32302)
Tallahassee, FL 32301
Phone Number: (850) 224-9115
Fax Number: (850) 222-7560

**Attorneys for Plaintiff**

.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 28, 2006, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: JEROME W. HOFFMAN, ESQUIRE, HOLLAND & KNIGHT, LLP, 315 Calhoun Street, Suite 600, Tallahassee, FL 32301, STEVEN L. BRANNOCK, ESQUIRE, DAVID C BORUCKE, ESQUIRE, HOLLAND & KNIGHT, LLP, 100 North Tampa Street, Ste. 4100, Tampa Florida 33602-3644, JAMES R. ATWOOD, ESQUIRE, COVINGTON & BURLING, One Front Street, San Francisco CA, 94111, JAY T. SMITH, ESQUIRE, CLAIRE G. KUNSTLING, ESQUIRE, JOHNATHAN GIMBLETT, ESQUIRE, COVINGTON & BURLING, 1201 Pennsylvania Ave., N.W. Washington, D.C., 20004-2401

/s/ William G. Kopit
_____

William G. Kopit
District of Columbia Bar No. 922070
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street NW
Washington, D.C. 20037
E-mail: wkopit@ebglaw.com
(202) 861-0900 Telephone
(202) 296-2882 Facsimile